Turning to the regular appeals calendar, United States of America v. Ortega Arrieta. Just a minute, Mr. Silver. Good morning. Good morning. May it please the court, my name is John Silver, and I'm the attorney general of the United States, the appellant, in this criminal matter. The government is asking this court to vacate and reverse the district court's determination that the statute of limitations ran on the criminal case against Mr. Ortega Arrieta, charging him with a violation of Title VIII United States Code, Section 1326, essentially re-entry, actually being found in the United States after having previously been removed from the United States. The facts are generally not in dispute. Mr. Ortega Arrieta is an alien. Back in the 1990s, he was removed from the United States. Subsequent to that, he came back unlawfully and became involved in criminal proceedings in the city of New York, which resulted in a court appearance in January of 2010. When Mr. Ortega Arrieta failed to appear again in connection with those unrelated state charges, the NYPD first obtained a bench warrant for Mr. Ortega Arrieta's failure to appear, and later, after Mr. Ortega Arrieta was indicted, obtained a warrant based on that indictment. That warrant was obtained in late 2010, but not entered into the NCIC database until December of 2011. When that occurs, the Department of Homeland Security, of which ICE is a part, their database automatically sweeps, or captures, if you will, entries that are made into the NCIC database. And the DHS database document that would have appeared in that database is in the appendix at A19. In response to Mr. Ortega Arrieta's motion to dismiss the indictment, Judge Hurd erroneously concluded that it was not just the fact that an arrest warrant had been issued in New York City, but that somehow address information associated with that arrest warrant had been swept up into the DH database. There's nothing in the record to support that conclusion, and it is directly contradicted by the two affidavits submitted by the Border Patrol agent Stephen Glenn. The government moved for reconsideration of the court's dismissal order. I should back up, saying when the district court made that determination, that address information was provided to the federal immigration authorities, it determined that that was the point, the latest point, at which Mr. Ortega Arrieta was found in the United States under the statute. There was no dispute, and there remains no dispute, that the government is Ortega Arrieta's presence in the United States is unlawful, the second half of the test. The government moved for reconsideration, explaining to the district court that there was nothing in the record to show that the federal immigration authorities had the address information that the court believed it did. Mr. Silver. So just looking at A19, which you provided, which was the query result that Homeland Security would have at the time that the arrest warrant information was included. So is it the case that whenever an arrest warrant is issued and that information is uploaded into this NCIS database, that it never includes address information, or they didn't do it in this case? The record doesn't reflect that. I've spoken to a number of people trying to ascertain more about the mechanics of this. I really can't answer that question. So then your position then is, any time an arrest warrant information is entered into the NCIS database, even though the arrest warrant, underlying arrest warrant itself may contain address information, that that information is not possession for these purposes under sort of the U.S. v. Williams test? Yes, at least in this case. So it really almost doesn't matter if address information had been entered into NCIS, because the mechanics of the system resulting in A19, or a document that reflects that, that would have been there at the time, does not capture the address information. Well, let me clarify some other things. What I understand A19 is, this is a document that was created for purposes of this litigation by someone at ICE or at the U.S. Attorney's Office directly querying the database and asking what they had on Mr. Ortega Arrieta. That's correct. So what happens with the NCIS, it essentially generates rap sheet type information. Is that a fair assessment that it contains information about people's records or people's warrants? I think that's fair, Your Honor. And my hesitation is, if someone was to query NCIS at this point in time, I have no doubt that Mr. Ortega Arrieta's address would be there. Because when you make a query of that database, you're going to capture all of the information that's been put in at various times. But that's a separate inquiry as to what happens when DHS sweeps that database. Exactly. This is, the document A19, with or without addresses, is the result of someone asking the computer, tell us what the database has on this particular individual. Is that what A19 is? Yes. So when the data is swept, essentially what happens is the NCIS data is carried over into a federal database. Would that database have, is there any record information or any public information about how many documents and individuals might have entries in the NCIS or ICE database? There's old information that I'm aware of, not new information. In this Court's Williams decision, I believe it was Williams, there was a reference to the fact that there were some 280,000 entries in that federal database. I was going to estimate several hundred thousand, so I guess that's, so what's happening is all the information about various people who are wanted for various things all over the country at a minimum, and maybe other information about, I'm not sure about whether NCIC is the database that contains all the RAPTURE information, but all of these people about whom various law enforcement agencies have information goes into this, right? But I think your position is that doesn't mean that the government knows, the federal government knows, in quotes, that Ortega Arrieta is even in the database, and it's only if you have some individual or to look for information about this of the many people that ICE might be interested in, in some way, would be in the database that you would ever get anything like A-19, let alone go behind that to see what, when they see there's a warrant, to find out what information might be on the warrant. I agree with that proposition, Your Honor. I have not pressed it because there was a case in the district court indicating that we knew of the arrest warrant by virtue of it having been uploaded. And then I tried to explain in my brief that that concession would Yeah, but of the two affidavits, the first one sort of made it seem as if some person sat there saying, oh, here's a warrant on the NCIC. I'll put that in the ICE database. And then the second affidavit clarifies that what actually happens is everything is automatically uploaded. So there's not even a person who saw it. And I suppose if some individual had seen it in that kind of context, there would be further questions as to what the significance of that is in terms of cross-referencing. Does anybody, there's a person who's a data enterer, if there were such a person, have any access to the information that would say, oh, this is a guy that we deported years ago. I mean, that's kind of the problem with this. And I hope I'm not misspeaking, but I think in Williams, that actually occurred where an analyst noted the fact of an arrest warrant and failed to forward that information to an INS agent. I'm dating myself, INS agent. And that was found not to have imparted the knowledge. Right. I mean, we crossed that bridge and said there's no due diligence requirement. It always strikes me as a little odd that if, for example, someone had thought to get an indictment and just said, hey, this guy, if we had any information that he was back in the country and he was indicted within, immediately, and no statute of limitations problem, United States against Doggett would say that the government has a due diligence obligation and denies him his feedy trial rights if they don't try to catch him hard enough. But in this circumstance, there's not even a due, even if the government was negligent, and I'm not suggesting it necessarily was here, that wouldn't be a problem. I had not thought of it in those terms. Just so, Mr. Silva, so the government's position is that once the information is loaded into the database, the idea is that possession would only happen if someone at the under end knows that the information is there? Is that what the government's position is? I agree with that proposition, Your Honor, but I have not pressed it as a point here because I think I could be criticized for doing so in light of what we represented in the district court. I think that's true. I think it would be totally unreasonable to say that the government has actual knowledge of these hundreds of . . . You're not actual knowledge, but I guess the question, I'm just trying to figure out what then means a possession of reliable information of the whereabouts of the individual? Is it information in a database or is it someone knowing there's information in the database having looked at the database and decided not to do anything about it, or is it you need to actually have this specific address? I'm trying to figure out what's the level that we get to where you get to the Williams standard. I don't think you have to answer that question in this case because even if someone in a position of authority, let's say, knew of the specific information in the federal database, it would not have provided address information. So I don't think you need to resolve to what extent the Department of Homeland Security can be held responsible for knowing what's there. Because your position is what someone would have had who actually looked in the database is A19, which does not have an address, and that person would then have to say, oh, but it says there's a warrant. I bet on a New York warrant there would be information about a person's address, at least as of the time the warrant was issued or whenever the police knew was an address or thought was an address. Let's call up that warrant. And that step, you're saying, would be either due diligence or extraordinary diligence. But either way, even if that's what a reasonable officer might have done, he doesn't have to satisfy the Williams standard. Yes. And if the address information was in this database, then I think the court would have to decide is that chargeable to the Department of Homeland Security. But because we know what was not there and never was there, you need not resolve that question. I'm sorry. No, you go. Just one last question. So do we know in this particular database what types of information would be entered? I mean, what are the circumstances when they ordinarily would put address information into the database? Because I'm trying to figure out, because if you're saying that putting in a document information that the underlying document may have address information is insufficient, I'm just trying to figure out what are the circumstances when you might put address information so the address information is there, so there is possession of the knowledge. My understanding, Your Honor, is that the Department of Homeland Security database will sweep all of the information in the NCI entry. And it's up to the officer or civilian sitting at a typewriter who's putting in the information that will determine what information is swept into the federal database. The person at the NYPD who was entering the warrant. Yes. So you're saying that there would be a place in the uploading of the data that allows for not just a rest warrant, but a rest warrant and an address? I'm going beyond the record, but that's my understanding, Your Honor. And the basis of that understanding is? I understand it's beyond the record. I'm just trying to make sure I understand. The basis for that understanding is my belief, based on this record, that the federal database sweeps all of the information in the NCIC entry. So it's a function of was the address put into the NCIC entry or not, whether it will appear in the federal database. That's how I read this record. Thank you. You've reserved two minutes for rebuttal. Ms. Corbett. Good morning. Molly Corbett from the Federal Public Defender Office in the Northern District of New York for Mr. Ortega-Arieta. Getting back to the questions about the type of information that is swept up into the NCIC, unfortunately for the Federal Public Defender's Office, we don't have access to those types of documents. And I think if the court were to look closely at the affidavits and the record that was produced by the government, you would see that they had tiptoed around the bounds of specific information as to how the DHS uses that information once it is acquired and how the database, the EARM and the different types of databases that the DHS functions with to use that information operate. We do have A-19, which, as Judge Lynch pointed out, does demonstrate that the federal authorities were in possession of significant information that could have led to, and reliable information. That pointed out that Mr. Ortega-Arieta had been in New York City, so was in the country in 2010 and, presumably, 2011, was illegally here. That he had been in New York City and he had an FBI number, he had an NCI number, he had a warrant that had issued from the NYPD, so at some point he had interacted with the NYPD, and there was a telephone number to contact within A-19, and under that it said to contact them immediately in reference to extradition. How is that different from Williams? It's not different. It's not so different from Williams, Judge Lynch. That's our problem, isn't it? I mean, I understand if this were a case of first impression, I would say, at least if there was any evidence that anyone had seen this record, that, well, what person who knew who Ortega-Arieta was and knew that he had been deported, who then saw that he had a warrant outstanding from New York, wouldn't at least make a phone call? Exactly. And isn't that what's occurring now? Right. I mean, that information is being tracked down. It's being pulled up and tracked down. And in Williams, it was because of an outstanding parking ticket that the federal authorities obtained the actual physical address. It wasn't through the validation procedure, which was a procedure that DHS, ICE at the time, was conducting. I understand that. But the question is, have we not held that the agency has no due diligence obligation, that even if a reasonable police officer who was interested in catching people who had returned after deportation, who saw this record, would have made that phone call, that the failure to make that phone call does not affect the question of whether the person the federal authorities had found Ortega-Arieta in the United States? Whether or not that, that's a different case. Because here, they had reliable information. No, no, no, no. They had reliable information that if they followed up on it, or they had information that if they had followed up on it, might have led to reliable information about his address. But they didn't follow up on it as the problem. Indeed, it's pretty clear that they didn't even know about A19. A19 is not something that somebody saw contemporaneously. It's something that someone created by punching the gentleman's name into the database, which no one would have had any occasion to do, unless you imagine, and I don't think that you'd want the federal government to be doing this. Maybe they do do it now, to punch daily the name of everybody who's ever been deported into this database, just to see whether they've turned up somewhere in the United States. I mean, they could do that, I guess. No, I don't believe so. But, I mean, that's what would have to happen for someone to actually see A19, let alone to have the problem of following up on it. Well, the record doesn't demonstrate what the functioning is within the DHS once an arrest warrant is uploaded from, or swept into the DHS. That is what's lacking from the record, unfortunately. And that's not information that the defendant could have been in possession of. That is only information that could have been presented by the government, and wasn't. Did anyone ask for a hearing, or for further exploration of the affidavits that the government had submitted? So, the government, in response to the, the government, in support of their motion for reconsideration, submitted apparently clarification affidavits from two DHS employees, one of whom was Agent Reynolds. And within Agent Reynolds' affidavit, I believe in paragraphs 4, 5, and 6, he indicates that the warrant information is updated, is uploaded into NCIC by the NYPD warrant squad. And then that information, the information is collected from the arrest report. And he went and got the arrest report, and saw that all of the pertinent information, address, and other information to specifically, physically locate Mr. Ortega-Arieta was within that arrest report. So, the, the presumption is that information was updated and uploaded into the NCIC by the NYPD arrest warrant unit. Now, to get back to your other point . . . I'm sorry. I want to get back to A-19. What, how does A-19 get into the record? I thought that A-19 is supposed to represent what a person would see about Ortega-Arieta from the DHS database. Are you suggesting that's not true, that there's more material they would have found? We, we don't know. I, I don't know what the query was to generate A-19, other than an indication at the top of the page that says NCIC. But what is the evidentiary foundation for admitting A-19 into the record at all? Who says this is what A-19 is, and what is it that that person says? A-19 was provided in discovery to the Federal Public Defender Office as having been a query that was generated at some point after Mr. Ortega-Arieta was arrested in 2017. So, is this not then in the record that's before the district judge? It was in front of the record before the district judge. It was Exhibit B to defendant's motion to dismiss. Ah, so you put it in. Yes, we did. But as far as what query it took to generate that and what types of queries, you know, the DHS... We don't know. Right. We, we don't know that. But there, there are, you know, three uncontradicted facts that one was that the, the NYPD uploaded that warrant, that that information was uploaded and more specific information was uploaded into the NCIC according to Reynolds Affidavit in support of the motion for reconsideration. That, that information from NCIC was swept up into DHS, as was indicated by both affidavits from Agent Glenn, and that that information resulted in an FBI number being generated. So the FBI authorities knew of, you know, had that information. DHS had that information. And, you know, we don't know what... Information. Are you not talking about there's a computer somewhere that has something on the order of 300,000 individual person's records in it, right? That's what you're talking about. And someone would have, whatever, wherever query would have to be input, some query would have to be made of that database for anyone to find any of the information in that record, right? That is correct. So what you're suggesting is that so long as information is in that database somewhere, the federal government is charged with the knowledge of that information, such that even if no one ever asked for it, no one ever saw it, no one ever looked at it, they, because if someone had gone into the database in some way, which would have to involve looking for either that address or that warrant or that name, they would... The federal government therefore knows where Mr. Ortega Arrieta is. Knows, not could find out with due diligence, but knows. Is that the proposition that you're, the legal proposition that we would have to adopt in order to affirm the district court? The legal proposition is what does it mean to actually discover the presence of the person? Right, that's the question. Exactly. What I'm asking is what is the answer? Is the answer not that you are asking us to adopt not, or is it or is it not, that what the federal government needs to know in order to know someone's whereabouts is that lurking in a computer somewhere, there is a warrant input by the NYPD that contains the person's address, a computer that is accessible to the federal government? That, well, that, the problem with the record is that that would have to be what we would ask you to adopt. And according to Williams, there was, there were procedures or have been procedures with immigration authorities where they do regularly look at information that is uploaded or provided to them to determine whether or not there are individuals that need to be reviewed. It's called the validation process. Now, that was not discussed and not entered into the, you know, into the record in this case. Unfortunately for Mr. Ortega-Arieta, not fully developed. The defendant here is between a rock and a hard place. The more facts that he tries to put in dispute, the more likely it is for him that he's going to have to go to trial to argue that based on the fact that a motion to dismiss can't be decided when factual dispute, a factual dispute is brought forward. The information that he had was that the federal authorities were in possession of reliable information that demonstrated where he was. It just wasn't that one. You're saying that therefore the indictment should be dismissed on a motion to dismiss because the face of the, because what? I mean, it's not the face of the indictment doesn't say anything here. You're saying you don't want to develop a factual record that might show what the government actually does know and so you rested on the record that we've got and say on the basis of that, there should be a finding that the federal government knew his whereabouts. No. The basis for the motion to dismiss and the information that was presented demonstrated that federal authorities had the information. Now, whether or not one, please, my question has been from the beginning, had the information when you say that means that it was somewhere in a database accessible to a federal agent. That's because, yes. And you're saying that once you've established that the fact that it is accessible to a federal agent means that the federal government knew his whereabouts for the purpose of Williams. Yes, exactly. Okay. And that's the proposition that you're, that effectively we would have to admit to him. Yes. That the federal authorities were on notice that he was here. Thank you, Ms. Garvin. Mr. Silver? Your Honors, I think I've covered what I need to say. I really have nothing to say in rebuttal unless the court has additional questions. I think not. Thank you. Thank you both. We'll reserve decision in this case.